**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ) | |
| JERRY MARSHALL, ) | |
| ) | |
|       **Petitioner,** ) | |
| ) | |
|   **v.** ) | **No. 07 C 4972** |
| ) | |
| NEDRA CHANDLER, ) | **Judge Rebecca R. Pallmeyer** |
| ) | |
|       **Respondent.** ) | |

## MEMORANDUM OPINION AND ORDER

In 1996, Petitioner Jerry Marshall was convicted by a Cook County jury of first-degree

murder. He was sentenced to a term of 40 years imprisonment. Marshall has now filed a petition

for a writ of habeas corpus under 28 U.S.C. § 2254. For the reasons set forth herein, Marshall's

petition for habeas corpus relief [11] is denied.

## BACKGROUND

### I.    Petitioner's Trial and Sentencing

When a Petitioner fails to present clear and convincing evidence challenging the statement

of facts set forth by a state court on appeal, a federal court presumes those facts to be correct for

the purpose of its habeas review. 28 U.S.C. § 2254(e)(1); *Daniels v. Knight*, 476 F.3d 426, 434 (7th

Cir. 2007). Here, Petitioner does not dispute the key facts. Accordingly, the court adopts the

factual account of the crime set forth by the Illinois Appellate Court on direct appeal. *People v.*

*Marshall*, No. 1-97-0345 (1st Dist. Ill. App. 1998)(Order, Ex. C to Resp.'s Ans.) The court also

adopts the factual findings made by the Appellate Court on post-conviction review following an

evidentiary hearing in this case. *People v. Marshall*, No. 1-05-0730 (1st Dist. Ill. App. 2007)(Rule

23 Order, Ex. K to Resp.'s Ans.)

Petitioner, who was 16 years old at the time of the incident, admits that he killed 18-year-old

Carlos Chambers by shooting Chambers twice—once through the back of the head and once

through the left cheek—on the afternoon of November 28, 1995.  (Order, Ex. C to Resp.'s Ans. at 1.)  In November 1995, both boys were students at Jones Commercial High School, located near the intersection of Harrison and State Streets in Chicago, Illinois.[1]  On November 22, Petitioner and Chambers, who were affiliated with rival street gangs, became involved in a gang-related fist fight outside of the school.  (*Id.* at 1, 2; Trial Tr. D 132-33, D 173:16-20.)  In the days following the scuffle, in which both Petitioner and Chambers were bloodied, the two had several angry verbal exchanges in and around the school.  Petitioner purchased a .25 caliber handgun from an associate on November 27.  (Trial Tr. E 55-57.)  After school on November 28, Chambers was walking with a group of other students near the intersection of State and Jackson Streets when Petitioner ran up, grabbed Chambers from behind, and shot him in the back of the head. (Ex. C to Resp.'s Ans. at 2.)

Judge Themis Karnezis of the Circuit Court of Cook County presided over Petitioner's jury trial.  The prosecution called Ebony Battles, a Jones student who witnessed the shooting, as a witness.  (Trial Tr. D 126.)  Battles testified that Petitioner was lying in wait for Chambers moments before the shooting.  From Battles's position across Jackson Street to the south of Chambers, she viewed Petitioner peeking around the corner of a building at Chambers before ultimately pursuing and shooting him.  (*Id.* at 140-41.)  Knowing the bad blood between the boys, Battles called out to Chambers to warn him of Petitioner's presence.  (*Id.* at D 141.)  Chambers's back remained turned, however, as Petitioner ran up from behind and fired on Chambers.  (*Id.* at D 142:2-5.)  The state also called Crystal Williams and Cornelius Patton, eyewitnesses to the shooting, whose testimony substantially corroborated Battles.  The witnesses did not see a weapon in Chambers's possession.

Chambers's cousin and fellow gang member, Germane Sykes, also took the stand, and testified that on the day before the shooting, Petitioner had warned that he was planning to "shoot

---

[1]    Jones Commercial High School is now known by the name Jones College Prep.

on State Street." (*Id.* at D 175:17-24.) Clayton Wade, a friend and fellow gang member of Chambers, similarly testified that on the morning of the shooting, Petitioner had told him, "After school your boy is going to be chasing me, I am going to have someone come up behind him and blast him." (*Id.* at D 206:4-7.)

Sykes stated that on the day of the murder, he, Chambers, and some other students followed Petitioner into a subway station near the school and confronted him. (*Id.* at D 180-81; Ex. C to Resp.'s Ans. at 2). Sykes acknowledged that Petitioner was accompanied only by his girlfriend, Kimberly Kidd, and by another girl, Rashidah Fahim. (Trial Tr. D 180-81.) Chambers and Petitioner again argued, and, according to Sykes, Chambers withdrew a small knife from his pocket and held it in his hand. (*Id.* at D 182-83.) Patrolling police officers soon arrived to break up the argument and dispersed the crowd of students. Chambers and Sykes exited the station from one stairway, and Petitioner and Fahim exited from another. (*Id.* at D 183-84.)

Petitioner testified in his own defense at trial. According to Petitioner, Chambers had been consistently harassing and threatening him since their fist fight on November 22. Petitioner claimed that he had approached Chambers in an attempt to quash the animosity between them, but that Chambers rejected the overture and told Petitioner that the matter was not settled. (*Id.* at E 33-34.) Petitioner admitted that, anticipating an escalation, he purchased a handgun on November 27 and brought it to school with him the following day. (Id. at E 55:3-21.) According to Petitioner, he unsuccessfully attempted to call his mother in an effort to leave school early that day to avoid any trouble with Chambers. (*Id.* at E 36:4-12.) When he could not reach his mother, however, Petitioner waited until the end of the school day and hurried to the nearest subway station with Kimberly Kidd and Rashidah Fahim. (*Id.* at E 39-40.) According to Petitioner, Chambers and Sykes chased him into the subway. After entering the subway, Sykes called Petitioner a "coward ass pussy" and then, according to Petitioner, Chambers pulled a silver handgun partially out of his pocket and flashed it at Petitioner. (*Id.* at E 42-44.) Petitioner testified that he was scared and,

when police officers arrived to disperse the crowd in the subway station, he fled with Fahim up the stairway and out of the station. (*Id.* at E 45-46.)

Donald Giddens, another student, testified that Chambers also exited the subway and walked north on State Street away from the scene. (*Id.* at E 97-101.) Petitioner claims, however, that he and Fahim fled to a nearby Burger King restaurant to escape from Chambers, but Chambers and his fellow gang members followed him to the Burger King and waited outside the restaurant smoking cigarettes. (*Id.* at E 47:5-17.) Petitioner testified that after a short time, he and Fahim exited the restaurant through an emergency door in the rear to evade Chambers, and then split up. (*Id.* at E 47-48.) Petitioner testified that he was headed toward a different subway station and had stopped at a newspaper stand at the corner of Jackson and State, when he next saw Chambers, crossing the street with some female friends. (*Id.* at E 80-82.) Chambers walked right past Petitioner, neither noticing nor acknowledging him. (*Id.* at E 5-19.) Petitioner testified that he was startled when he heard someone shouting to Chambers, so he drew his gun and ran up behind Chambers, firing into the back of Chambers's head. (*Id.* at E 82:2-21.)

Petitioner admits that Chambers's back was turned and that Chambers was not threatening him at the time of the shooting. Petitioner's testimony also shows that, while Petitioner was afraid of Chambers, he did not apprehend an imminent risk of harm at the time of the shooting:

> Q: Jerry, why did you shoot Carlos Chambers?
> A: Because I thought he was going to try to kill me.
> Q: When?
> A. The next time he saw me.
> Q: Which was when?
> A: The next day when I came to school.

(*Id.* at E 86-87.) The defense rested without presenting any evidence other than Petitioner's testimony. In rebuttal, the state presented the testimony of a paramedic who treated Chambers at the scene and established that Chambers had no weapons on his person when emergency responders arrived. (*Id.* at 4.)

4

At defense counsel's request, the trial court instructed the jury on Illinois's self-defense doctrine, but the jury ultimately found Petitioner guilty of one count of first-degree murder. (*Id.* at 5; Trial Tr. at E 90.) After a hearing in which Petitioner presented five witnesses in mitigation, Judge Karnezis sentenced Petitioner to a sentence of 40 years imprisonment.

## II.    Petitioner's Direct Appeal

On appeal, Petitioner argued that the state had failed to meet its burden of proof for first-degree murder in light of his evidence of self-defense, and that his 40-year sentence was excessive. The Illinois Appellate Court denied both claims. The court concluded that, viewed in the light most favorable to the prosecution, the evidence supported the verdict. (Order, Ex. C to Resp.'s Ans. at 5.) "While a dispute existed between defendant and deceased," the court said, "the State's evidence showed that it was defendant who held the grudge and would seek retribution. Defendant did attempt to establish the contrary conclusion, but the jury apparently rejected defendant's claim." (*Id.*) Even assuming Chambers had previously threatened Petitioner, the court found, "the record shows that at the time of the shooting, deceased was not threatening defendant. Rather the undisputed testimony established that defendant ran up to [decedent] from behind and shot him in the head." (*Id.*) Nor did the court find any abuse of discretion in Petitioner's sentence. (*Id.* at 6.) Petitioner's *pro se* petition for leave to appeal to the Illinois Supreme Court was denied. (PLA, Ex. D to Resp.'s Ans.; Order, Ex. E to Resp.'s Ans.) Petitioner did not file a petition for a writ of certiorari to the United States Supreme Court.

## III.   Petitioner's Post-Conviction Review

In December 1998, Petitioner filed a *pro se* post-conviction petition in the Circuit Court of Cook County, contending that his trial counsel was ineffective for failing to call witnesses who would have corroborated his testimony that Chambers was armed. (Petition, Ex. F to Resp.'s Ans.) In support, Petitioner submitted to the affidavits Kimberly Kidd and her friend, Tykesha Rose. Kidd's affidavit stated that she was present during the subway altercation and that, in her view, "it

appeared as if Chambers was reaching for a weapon" when he placed his hand in his pocket. (Rule 23 Order, Ex. K to Resp.'s Ans. at 9.) Rose admitted that she did not actually witness the exchange between Chambers and Petitioner in the subway, and neither Kidd nor Rose claimed to have actually seen Chambers with a gun. (*Id.*)

Petitioner filed a supplemental post-conviction petition in 2004, this time with the assistance of counsel, in which he repeated his ineffective assistance claim and attached the affidavits of Greylen Brials and Rashidah Fahim. (Sup. Petition Ex. G to Resp.'s Ans.) Brials stated that he was present for the encounter between Petitioner and Chambers in the subway and that he saw Chambers briefly withdraw what Brials believed to be a gun. (*Id.*) Fahim stated that she too was present in the subway, saw Chambers with a gun, and fled with Petitioner to a nearby Burger King. According to Fahim, Chambers and about twelve other people surrounded the restaurant and yelled at Petitioner that he was "going to leave in a body bag." (Rule 23 Order, Ex. K to Resp.'s Ans. at 5.) Fahim confirmed that she and Petitioner left the Burger King through an emergency exit and parted ways. Fahim stated that she was interviewed by Petitioner's trial counsel on two occasions, but she was not called to testify at trial. Brials claimed that trial counsel did not contact him at all. Both Brials and Fahim stated that, if called, they would have been willing to testify at Petitioner's trial. Neither Brials nor Fahim claimed to have witnessed the actual shooting.

At a hearing on January 4, 2005 before Judge James Linn of the Circuit Court of Cook County, Petitioner testified that he gave his trial attorneys, Irwin Franzin and Jennifer Franzin, a list of potential witnesses, including Brials and Fahim. (*Id.* at 6.) Petitioner testified that when he asked Irwin Franzin during the trial what had happened to his witnesses, Franzin replied that it was too late to call them. (*Id.*) Brials and Fahim testified consistently with their affidavits concerning the events of November 29, 1995. Fahim testified that she was interviewed twice by Jennifer Franzin, once in person and once over the telephone, but was not called to testify. (*Id.* at 5.) Brials admitted that in August 1996, the time of Petitioner's trial, he was in state custody at the Cook County Jail

facing sexual assault charges.  (*Id.* at 6.)

The state called Ann Chambers and Michael Gerhardtstein, Chicago police detectives who interviewed Brials and Fahim shortly after the shooting.  According to Detective Chambers, Fahim told her that she had never seen the decedent with a gun.  (*Id.*)  Instead, Fahim described decedent as "making a pistol play," that is, acting as if he had a gun.  (*Id.*)  Fahim also told police that after she and Petitioner left the subway, Fahim warned Petitioner that she was afraid decedent might shoot him, but Petitioner replied, "Don't worry, I'm straight," and patted his pants pocket to indicate that he was armed.  (Hearing Tr. FF 81:7-22).  Detective Chambers testified, further, that Fahim told police that she had seen the outline of a gun in Petitioner's pocket.  (*Id.* at FF 81-84.)  According to Detective Chambers, Fahim also told police about a phone call she had received from Petitioner shortly after the shooting, in which Petitioner stated that he hoped the decedent did not die, but said, "It had to be done . . . Maybe this would keep his mouth quiet and that he would stop bullying people."  (*Id.* at FF 84-85.)  In her testimony, Fahim admitted to being interviewed by police, though she denied making the statements attributed to her.

Detective Gerhardtstein testified that he interviewed Brials the day after the shooting.  (Rule 23 Order, Ex. K to Resp.'s Ans. at 7.)  According to Gerhardtstein, Brials stated that he had been present at the subway confrontation and had stepped between Petitioner and Carlos Chambers during their argument.  Brials told police that Chambers reached into his pocket as if he had a gun, but Brials reached out and patted Chambers's pocket and felt no weapon there. (*Id.*)  In his testimony, Brials admitted to being interviewed by police, but denied having told Gerhardtstein that Chambers was unarmed.

Petitioner's trial counsel, Irwin Franzin, also testified at the post-conviction hearing.  Franzin reported that in preparing Petitioner's defense at trial, he had reviewed all police reports and spoke with Petitioner on several occasions, but Petitioner never mentioned having seen Chambers with a gun.  (*Id.*)  Franzin confirmed that Petitioner had provided him with a list of several potential

witnesses, and stated that Franzin and his co-counsel Jennifer Franzin had interviewed all of the witnesses they deemed necessary, though he could not remember their names. (*Id.*) According to Franzin, the witnesses he spoke with told him that Petitioner was upset after losing the fist fight and that it was Petitioner, rather than Chambers, who "wasn't through with this." (*Id.*) Franzin determined that the information provided by these witnesses would not be helpful to the defense at trial. Franzin testified that he contacted Brials's attorney (Franzin could not remember the attorney's name) in an attempt to interview Brials, who was in Cook County Jail at the time, but the attorney refused to allow Franzin to speak with Brials. (*Id.*) Franzin denied ever telling Petitioner that it was too late to call witnesses. (*Id.*)

Judge Linn denied the request for a new trial (Hearing Tr. II 55), and the Appellate Court affirmed. (Rule 23 Order, Ex. K to Resp.'s Ans. at 14.) Applying *Strickland v. Washington*, 466 U.S. 668 (1984), the court concluded that Franzin's decision not to call Fahim or Brials was reasonable and that Petitioner suffered no prejudice as a result. (*Id.* at 10.) The court noted that Fahim and Brials's prior inconsistent statements made their testimony vulnerable to impeachment and potentially damaging to the defense. (*Id.*) The court also observed that Franzin had made sufficient efforts to investigate and interview defense witnesses, including Fahim and Brials, and through no fault of his own, counsel was unable to interview Brials. (*Id.* at 11.) Finding no prejudice, the court also emphasized that "no potential defense witness claimed to have been at the place of the fatal shooting when the defendant fired his gun." (*Id.* at 11.) Petitioner sought leave to appeal to the Illinois Supreme Court, but his petition for leave to appeal was denied and Petitioner again failed to file a petition for a writ of certiorari to the U.S. Supreme Court.

Petitioner has exhausted all available state remedies, making his claims ripe for habeas review. Applying the legal standards governing federal habeas review, the court denies Petitioner's claims for relief for the reasons stated below.

**I.      Standard of Review for Habeas Relief**

Under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), this court will grant habeas relief only where the decision of the state court was "contrary to or involved an unreasonable application of clearly established Federal law" or was "based on an unreasonable determination of the facts."  28 U.S.C. § 2254(d)(1-2)(2000).  Factual determinations made by the state court are presumed correct unless the petitioner rebuts the presumption by clear and convincing evidence.  *Daniels*, 476 F.3d at 434.

A state court's decision is "contrary to" clearly established federal law  "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law; [or] if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the United States Supreme Court]."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  A state court's decision is an "unreasonable application" of clearly established federal law when the state court clearly identifies the correct legal rule but applies that rule unreasonably.  *Williams*, 529 U.S. at 407.  "An unreasonable application of federal law is different from an *incorrect* application of federal law."  *Id.* at 410.  "Unreasonable application" means that the state court's decision is "well outside the boundaries of permissible differences of opinion."  *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002).

The court addresses this petition with these deferential standards in mind.

**II.     Claim I – Sufficiency of the Evidence**

Petitioner first claims that the evidence presented by the state at his trial was insufficient to support a conviction of first-degree murder, in light of Petitioner's claim of self-defense.  Petitioner contends that the trial evidence established that he shot Carlos Cambers under the belief that his actions were necessary to save his own life, and that the state failed to sufficiently demonstrate otherwise.

Due process requires that the state produce evidence sufficient to support a finding of guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319-21 (1979). A court reviewing the sufficiency of the evidence construes the evidence in the light most favorable to the verdict, however, and considers whether any rational trier of fact could have found in the evidence sufficient proof to establish guilt beyond a reasonable doubt. *Id.* at 319; *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003)*; Cabrera v. Hinsley*, 324 F.3d 527, 533 (7th Cir. 2003). The reviewing state court properly identified this governing standard. (Order, Ex. C to Resp.'s Ans. at 5.) Although the Illinois Appellate Court did not specifically cite *Jackson*, it was under no obligation to do so. *Early v. Packer*, 537 U.S. 3, 8 (2002).

The sole question then is whether the Illinois Appellate Court's application of *Jackson* was objectively unreasonable. The court finds that it was not. In Illinois, like many jurisdictions, self-defense is an affirmative defense that requires (1) a threat of unlawful force, (2) that the defendant was not the aggressor, (3) that the danger of harm was imminent, (4) that the use of force was necessary, (5) that the defendant had a genuine, subjective belief that a danger existed requiring the use of force applied, and (6) that the defendant's belief was reasonable. *People v. Lee*, 213 Ill. 2d 218, 225, 821 N.E.2d 307, 310 (2004). Once a defendant raises a claim of self-defense, the state has the burden of negating one or more of the elements of that claim beyond a reasonable doubt. *Id.* Under Illinois law, if the trier of fact determines that a defendant had an unreasonable belief that he was acting in self-defense when he used deadly force, the defendant may be guilty only of the lesser offense of second-degree murder. *People v. Jerome*, 206 Ill. App.3d 428, 432, 564 N.E.2d 221, 223-24 (2nd Dist.1990).

At Petitioner's trial, the state presented the eyewitness testimony of Ebony Battles, who testified that she saw Petitioner lying in wait for Carlos Chambers before shooting him. Two other witnesses testified that, in the day before the shooting, Petitioner had threatened to shoot or have someone shoot Chambers. Petitioner admitted that he had purchased and was carrying a gun in

10

anticipation of confronting Chambers.  Petitioner's own testimony confirmed that he approached Chambers from behind and shot him in the back of the head at a time when Chambers was not threatening Petitioner and was not even aware of his presence.  Petitioner's testimony also demonstrates that, while he was generally afraid of Chambers, he understood that he was under no risk of imminent harm at the time of the shooting; Petitioner believed Chambers would not attempt to harm him until the following day.

The Illinois Appellate Court found that a jury could reasonably have concluded that Petitioner was neither acting in self-defense nor that he believed himself to be acting in self-defense when he shot Carlos Chambers in the back of the head.  The court cannot say that the Illinois court's determination in this instance was unreasonable.  Petitioner's claim for relief is denied.

### III.     Claim II – Ineffective Assistance of Counsel

Petitioner next claims that his trial counsel was ineffective "for failing to investigate or present several witnesses, including Rashidah Fahim and Greylen Brials, who would have corroborated" Petitioner's testimony at trial.  (Petition, D.E. 11, at 5.)  Petitioner also mentions potential witnesses Kimberly Kidd and Tykesha Rose in his supporting brief.

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of legal counsel at trial.  *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a court evaluates an ineffective assistance claim under a two-part test.  The defendant must show (1) that his attorney provided deficient representation, and (2) that he was prejudiced by his attorney's deficiencies.  *United States v. Fuller*, 312 F.3d 287, 291 (7th Cir. 2002).  In this case, the Illinois Appellate Court correctly identified and applied the principles of *Strickland*; accordingly, on habeas review, Petitioner "must do more than show he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance."  *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  Instead, "he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  *Id.* at 699.  Petitioner cannot do so on this record.

The Illinois Appellate Court concluded both that Petitioner's trial counsel was not deficient and that Petitioner suffered no prejudice. With respect to Rose and Kidd, the court found "[t]here is no indication the testimony of Rose . . . or Kidd would have helped [Petitioner's] case. According to their affidavits, neither Rose nor Kidd saw [decedent] with a gun." (Rule 23 Order, Ex. K to Resp.'s Ans. at 9-10.) With regard to Brials and Fahim, the court found that both potential witnesses were subject to damaging impeachment based on their earlier inconsistent statements to police. (*Id.* at 11.) Both had previously told police that they had not actually seen Chambers with a gun and, in fact, subjectively believed that Chambers did not have gun during the subway confrontation. (*Id.*) Fahim also told police about receiving an incriminating phone call from Petitioner after the shooting. Impeachment evidence of the phone call might have proved very damaging to Petitioner's case had it been made known to the jury. Defense counsel had read the police reports and interviewed Fahim twice and was surely aware of the potential risks of calling her to testify. Likewise, while Petitioner's trial counsel did not actually speak with Brials, he made reasonable efforts to investigate by contacting Brials's attorney, who refused access to Brials. That Brials was at the time of Petitioner's trial in state custody on a charge of sexual assault, for which he was later convicted, may have been sufficient information for Franzin to reasonably conclude that Brials was not the ideal defense witness.

In any event, Petitioner suffered no prejudice from counsel's decision not to call these witnesses. No potential defense witness claims to have any first-hand knowledge of the most critical occurrence in Petitioner's case: the moment when Petitioner ran up to his victim from behind and fatally shot him in the head.

If trial counsel conducts substantial investigations of plausible lines of defense, the strategic choices made as a result "will seldom if ever" be found wanting on review. *Strickland*, 466 U.S. at 681. Courts are not in the business of playing "Monday morning quarterback" to review trial counsel's tactical decisions at trial, *United States v. Recendiz*, 557 F.3d 511, 531 (7th Cir. 2009),

and whether to call a witness is ordinarily a tactical decision entitled to deference.  *See*, *e.g.*, *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997); *Valenzuela v. United States*, 261 F.3d 694, 699-700 (7th Cir. 2001).  The Illinois court did not act unreasonably when it determined both that Petitioner's counsel was not deficient and that Petitioner suffered no prejudice.  Accordingly, Petitioner's claim for relief must be denied.

## **CONCLUSION**

For the reasons stated above, Petitioner Marshall's petition for habeas corpus [11] is denied. The case is dismissed.

ENTER:

Dated: January 13, 2010

REBECCA R. PALLMEYER
United States District Judge